UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:20-cr-00213-TWP-MJD |
| ) | |
| CAROLYN ANDERSON, and ) | -01 |
| TODD ANDERSON, ) | -02 |
| ) | |
| Defendants. ) | |

### ORDER ON DEFENDANTS' MOTION TO TRANSFER VENUE

This matter is before the Court on a Motion to Transfer Venue to the District of Arizona filed by Defendants Carolyn Anderson and Todd Anderson (together, the "Andersons") pursuant to Federal Rule of Criminal Procedure 21(b) (Filing No. 102).  A grand jury in the Southern District of Indiana issued an Indictment and Superseding Indictment charging the Andersons with conspiracy to import controlled substances, conspiracy to possess with intent to distribute controlled substances, and distribution of controlled substances. (Filing Nos. 13, 76.)  Almost two years after the original Indictment was issued, and just five weeks before their trial was set to begin,[1] the Andersons filed a Motion to Transfer, asking the Court to transfer this action to the United States District Court for the District of Arizona.  For the following reasons, the Court **denies** their Motion.

### I.   LEGAL STANDARD

A defendant may seek change of venue under Federal Rule of Criminal Procedure 21(b), which gives district courts discretion to "transfer the proceeding . . . to another district for the

---

[1] At the time the Andersons filed their Motion to Transfer Venue on July 22, 2022, the Final Pretrial Conference was set for August 8, 2022, and trial was set for August 29, 2022 (Filing No. 102 at ¶ 2).

convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). In deciding whether to exercise their discretion under Rule 21(b), district courts consider ten factors announced by the United States Supreme Court in *Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. 240 (1964), (the "*Platt* factors"):

> (1) location of a corporate defendant;[2] (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district . . . involved; and (10) any other special elements which might affect the transfer.

*Platt*, 376 U.S. at 244.

"The Court must weigh all of the factors, and no one factor is dispositive." *United States v. Reis*, No. 1:08-cr-165, 2009 WL 3256217, at *1 (S.D. Ind. Oct. 8, 2009) (citing *United States v. Morrison*, 946 F.2d 484, 489 & n.1 (7th Cir. 1991) (applying *Platt* factors)). The district court should grant a request under Rule 21(b) if, "'all relevant things considered, the case would be better off transferred to another district.'" *Id.* (quoting *In re Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995)).

## II.   DISCUSSION

The Superseding Indictment alleges the Andersons, who reside and work in Flagstaff, Arizona, conspired to import poppy pods containing poppy straw and detectable amounts of morphine from the United Kingdom to their properties in Flagstaff and Tucson, Arizona, for subsequent distribution to locations throughout the United States, including Indiana ([Filing No. 76](#)). The Superseding Indictment alleges the Andersons communicated with undercover agents and a cooperating individual based in Indianapolis, Indiana to arrange for the sale and shipment of poppy pods to Indiana. The Andersons allegedly conspired to distribute and distributed poppy

---

[2] Since *Platt*, courts have interpreted this factor to include residences of individual defendants. *United States v. Reis*, No. 1:08-cr-165, 2009 WL 3256217, at * (S.D. Ind. Oct. 2009); *Jones v. Gasch*, 404 F.2d 1231, 1240 (D.C. Cir. 1967).

pods to the Southern District of Indiana. The Court will address each of the *Platt* factors in turn before determining whether, "all relevant things considered," this case should be transferred to the District of Arizona.

A.   *Platt* **Factors**

    1.   **Location of Defendants**

The Andersons live and work in Arizona, so the first *Platt* factor favors transfer. However, "'[c]riminal defendants have no constitutional right to have a trial in their home districts, nor does the location of the defendant's home have "independent significance in determining whether transfer to that district would be in the interest of justice."'" *United States v. Zylstra*, 713 F.2d 1332, 1336 (7th Cir. 1983) (quoting *United States v. McManus*, 535 F.2d 460, 463 (8th Cir. 1976) (quoting *Platt*, 376 U.S. at 245–46)); *see Jones v. Gasch*, 404 F.2d 1231, 1240 n.43 (D.C. Cir. 1967) (approving of district court's decision to treat defendant's residence "'as a factor to be considered,' but 'not the controlling factor,' deriving significance solely from its relationship to the convenience of witnesses, records and counsel"). The Court accordingly affords this factor "minimal weight in its analysis." *United States v. Hassanshahi*, No. 12-0274, 2015 WL 7307079, at *2 (D.D.C. Nov. 19, 2015).

    2.   **Location of Possible Witnesses**

The location of possible witnesses weighs heavily against transfer. Most of the Government's witnesses are located in or around Indianapolis. These witnesses include the United States Drug Enforcement Agency ("DEA") case agent assigned to the Andersons' case; the seven-member team that led most of the investigation, including the controlled purchases, surveillance, searches, interviews, maintenance of controlled substance evidence, and records analysis; two Government analysts; and the Government's cooperating witness (Filing No. 117 at 7). In addition to constituting most of the Government's witnesses, these local witnesses "will represent the bulk

of the testimony" in the Government's case in chief, which the Government expects to last several days.

The Andersons argue Arizona is the more convenient venue because their potential witnesses "would be located near the Defendants' residence in Arizona" (Filing No. 102 at 6). The Andersons identify only four potential witnesses for their case in chief: themselves, their attorney from a 2015 federal investigation, and their tax accountant. *Id.* However, the Andersons offer no certainty as to whether they will call any witnesses at all. The Government, on the other hand, has confirmed it intends to call all eleven of its local witnesses. *See United States v. Schoor*, 597 F.2d 1303, 1308 (9th Cir. 1979) (affirming denial of motion to transfer venue in part because government evidence and witnesses were located in California, despite defendant's business records being located in Florida and defendant's character witnesses being located in New York).

Of the witnesses located in Indianapolis and Arizona, most of them are located substantially closer to Indianapolis. The Government—who has the burden of proof and must call witnesses—intends to call seven expert witnesses; four are located in Chicago, Illinois, two are located in Maryland, and one is located in Oregon (Filing No. 117 at 5). The expert witnesses in Maryland and Oregon will all need to travel several hundred miles for a trial in either Indianapolis or Arizona, so their locations are a neutral consideration. The four expert witnesses in Chicago, however, would be less burdened if trial were held in Indianapolis. Chicago is within a day's drive of Indianapolis, and driving, compared to flying, would likely be the shorter, cheaper, and more flexible option for those witnesses (Filing No. 117 at 9).

Because Indianapolis would be a more convenient venue than Arizona for almost all of the Government's eighteen witnesses and would be less convenient than Arizona for only the Andersons and their two unconfirmed witnesses, this *Platt* factor weighs heavily against transfer.

4

### 3. Location of Events Likely to be in Issue

"The parties agree where most of the alleged conduct took place, but their characterizations of the focal point of the conduct differ." *Reis*, 2009 WL 3256217, at *4 (evaluating third *Platt* factor as to alleged fraudulent scheme based in New York with victims in several states, including Indiana). The Andersons, on the one hand, focus on the location of their alleged actions—Arizona. The Andersons allegedly operated importation and distribution conspiracies from their home and/or businesses in Arizona and possessed poppy pods and firearms on a property they maintained in Flagstaff, Arizona, in furtherance of those conspiracies. *Id.* ¶¶ 12, 18, 36, 38. The Andersons allegedly corresponded with their poppy pod supplier from Arizona and received imported shipments of poppy pods at their Arizona addresses. The Andersons also allegedly operated a website advertising the sale of poppy pods, corresponded with prospective buyers, sent shipments of poppy pods to those buyers, and received payment from buyers, all from Arizona.

The Government, on the other hand, focuses on the location of its investigative conduct and the target of the Andersons' alleged actions—Indiana. The undercover agents and cooperating individual with whom the Andersons communicated operated from Indianapolis. The agents' communications and payments to the Andersons originated from Indianapolis. Further, Counts 1, 3, 4, and 5 of the Superseding Indictment charge the Andersons with conspiring to possess with intent to distribute, and with distributing, poppy pods to Indiana.

The events that could be in issue at trial occurred in many states. Arizona was the "nerve center" of the Andersons' alleged importation and distribution conspiracies and the origin point of the alleged distributions of controlled substances. *Reis*, 2009 WL 3256217, at *4. Arizona is therefore "the district where most events occurred, but Indiana ranks second" because much of the alleged conduct taking place in Arizona was allegedly directed toward Indiana and taken to

facilitate the distribution of poppy pods in Indiana. This *Platt* factor weighs in favor of transfer, but not "overwhelmingly so." *Id.*

### 4. Location of Evidence Likely to Be Involved

The fourth *Platt* factor weighs heavily against transfer because almost all of the evidence in this case is located in Indianapolis. Although most of the Government's physical evidence, including poppy straw, firearms, documents, and electronic devices, was located in Arizona during the alleged offenses, the Government seized that evidence in August 2020 and transported it to Indianapolis (Filing No. 117 at 4; Filing No. 102).

The Andersons argue it would be "grossly unfair to permit the government to 'create' venue, or to alter the balance of relevant considerations," by moving evidence to Indianapolis. (Filing No. 102 at 9; Filing No. 126 at 2 (citing *United States v. Bein*, 539 F. Supp. 72 (N.D. Ill. 1982))). "It is clear that the government cannot strengthen its case for venue by shipping the defendants' *documents* from their residences to the government's preferred venue." *Reis*, 2009 WL 3256217, at *4 (emphasis added); *see Bein*, 539 F. Supp. at 74 (stating it would be "grossly unfair" for the government to create venue "simply by shipping documents," which could "just as easily be moved back" to the defendants' proposed venue, "or photocopies may be shipped there"). However, in this case, the Government did not merely ship documents to Indianapolis. The Government ran its investigation from Indianapolis and allegedly seized packages containing controlled substances that the Andersons shipped to and around Indianapolis. *See Reis*, 2009 WL 3256217, at *4 (considering the location from which the government ran its investigation in applying the fourth *Platt* factor). The Government also transported over one thousand pounds of poppy straw and twenty-five firearms, all of which are currently being housed in Indianapolis with the assistance of local and state DEA partners (Filing No. 117 at 10). The remaining portions of the Government's "drug exhibits" are currently being stored at a DEA laboratory in Chicago and could

6

be driven to Indianapolis within a few hours. *Id.* Moving this evidence back to Arizona would require the use of a DEA airplane and the creation of new partnerships with local and state agencies in Arizona. *Id.* This type of physical evidence, unlike documents, cannot be easily mailed, faxed, or digitally transferred back to Arizona. The fourth *Platt* factor therefore weighs heavily against transfer.

### 5. Disruption of Defendants' Business

The Andersons state they operate several dried flower businesses out of Flagstaff and Tucson, Arizona, and that a trial in Indianapolis would disrupt those businesses. However, the Andersons do not explain why their physical presence in Arizona is needed to avoid disruption to their businesses, and the Court is reluctant to agree that trial in Indianapolis would be more disruptive than trial in Arizona for three reasons. First, with the widespread use of the internet, cell phones, laptops, email, and videoconferencing, nearly all business can be conducted remotely. *United States v. Kolfage*, No. 20 Cr. 412, 2020 WL 7342796, at *5 (S.D.N.Y. Dec. 14, 2020) ("Shea has not demonstrated why remote technology, which is now all the more common under pandemic circumstances, would not permit him to manage his business from afar."). Because Flagstaff and Tucson are located roughly two hundred fifty miles apart,[3] the Andersons almost certainly already conduct some of their business remotely, and the Superseding Indictment alleges the Andersons conduct their dried flower businesses via website, email, and text messaging (Filing No. 117 at 2). Second, the Government notes that the Andersons employ at least two people to assist with their dried flower business, one of whom is their son (Filing No. 117 at 14). The

---

[3] The Court may take judicial notice of distance estimates from Google Maps, "a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining' general distances. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013) (quotation marks and citation omitted); *see United States v. Julius*, 14 F.4th 752, 756 (7th Cir. 2021).

7

Andersons do not deny employing at least two other individuals and do not dispute that those individuals could manage the dried flower businesses during trial. Third, the Andersons' businesses would be disrupted regardless of the trial's location. *See United States v. Milton*, No. 21 Cr. 478, 2021 WL 5304328, at *8 (S.D.N.Y. Nov. 15, 2021) ("[I]nconvenience and interference with normal occupational and personal activities necessarily occur whenever a defendant is standing trial, [so] this factor does not favor transfer." (quotation marks and citation omitted)). Even if trial were held in Arizona, the Andersons would not be able to be physically present at work during business hours because they would be at trial, and their evenings and weekends may be "consumed analyzing the evidence that has been admitted and preparing for the remainder of trial." *United States v. Wilson*, No. 01 CR. 53, 2001 WL 798018, at *3 (S.D.N.Y. July 13, 2001).

The Andersons cite three cases in arguing that this *Platt* factor favors transfer, but two of those cases were decided in 1978 and 1986, before the proliferation of the internet, and even the most recent case, from 2002, preceded the widespread use of laptops and smartphones. *United States v. Ringer*, 651 F. Supp. 636, 638 (N.D. Ill. 1986); *United States v. Aronoff*, 463 F. Supp. 454, 455 (S.D.N.Y. 1978); *United States v. Fassnacht*, No. 01 CR 0063, 2002 WL 63523, at *4 (N.D. Ill. Jan. 15, 2002). Further, two of those decisions noted that the trials were expected to last between three and six weeks. *Ringer*, 651 F. Supp. at 638; *Aronoff*, 463 F. Supp. at 455. Here, the Government anticipates spending one week on their case in chief, and if the Andersons decide to call any witnesses, they will call, at most, only four witnesses (Filing No. 102 at ¶ 23). The cases cited by the Andersons are therefore distinguishable and unpersuasive. The potential disruption to the Andersons' businesses weighs in favor of transfer, but only minimally.

### 6. Expense to the Parties

The Andersons argue a trial in Indianapolis would be "extremely costly" because they would need to pay for "airfare, lodging, and food for themselves, their family and their witnesses"

(Filing No. 102 at 11).[4] Although the Andersons would need to incur some travel-related expenses if trial were held in Indianapolis, the Court does not believe those expenses would be "extreme". The Andersons would be required to pay travel expenses for themselves for a one-week trial, and they may incur travel expenses for their two possible witnesses. However, the Andersons have not confirmed that they will call those witnesses and, even if called, those witnesses would not be required to stay for the entirety of trial, so they would incur limited lodging and food expenses.[5] The Andersons would not be required to cover travel expenses for family members who choose to attend trial, and they would not need to cover airfare or lodging expenses for their counsel, who are based in Indianapolis (Filing No. 117 at 11). Moreover, to the extent the Andersons would be required to incur travel expenses, "[t]he [C]ourt cannot determine with any precision the impact of the extra expenses the parties will incur if the case is transferred or remains in this district," because "it is not clear how many of [the Andersons'] assets remain after the government's seizures." *Reis*, 2009 WL 3256217, at *5.

The Government contends it will incur significant expenses if trial is held in Arizona because it will be required to transport over one thousand pounds of evidence across the country and accommodate travel and lodging expenses for its numerous witnesses and all counsel. *Id.* The Andersons argue that the Court should not consider the Government's expenses in evaluating this factor because the Government has, "for all practical purposes, unlimited financial resources to bring to bear. Unlike the [defendants], the Government can, and does, mint money." *United States*

---

[4] The Andersons note in their Motion that their travel expenses would double if the Government's Motion to Sever Joint Trials were granted (Filing No. 102 at ¶ 51), but the Government has since withdrawn its Motion to Sever Joint Trials (Filing No. 106; Filing No. 112).

[5] The Court also notes that the Andersons may incur travel expenses for themselves and their witnesses even if venue were transferred because the District of Arizona may assign this case to any of its divisions, including its Tucson Division, which is hundreds of miles away from the Andersons' and their witnesses' homes in Flagstaff.

*v. Coffee*, 113 F. Supp. 2d 751, 757 (E.D. Pa. 2000). However, "[d]istrict courts have disagreed about whether and how much weight to give to the government's expenses," and this Court has previously declined to entirely ignore the Government's financial burdens. *Reis*, 2009 WL 3256217, at *5. "Although the government does indeed have the power to mint money, this blithe approach to the issue does not take into account the practical realities of limited resources and tight budgets." *Id.*; *accord Ringer*, 651 F. Supp. at 639 ("The court agrees with the Government that a proper analysis of this factor cannot disregard the expenses the United States would incur if the prosecution were transferred."); *United States v. Quinn*, 401 F. Supp. 2d 80, 88 (D.D.C. 2005) ("*Platt* explicitly calls for courts to consider the 'expense to the *parties*,' rather than the 'expense to the *defendant*.'" (quoting *Platt*, 376 U.S. at 244) (emphasis in original)).

The Government would incur significantly more expense on a trial in Arizona than the Andersons would on a trial in Indianapolis, but because the Government has a much greater ability to pay those expenses, this factor is neutral.

### 7. Location of Counsel

All counsel of record are located in Indianapolis. The Andersons argue this factor weighs in favor of transfer because upon transfer, they would either retain new Arizona counsel or bring their Indianapolis counsel with them (Filing No. 102). In either case, the Andersons would be burdened by their new counsel's unfamiliarity with the case just weeks before trial or by their current counsel's travel expenses, possible lack of admission to practice in the District of Arizona, and potential unfamiliarity with the District of Arizona's local rules and procedures. The fact that the Andersons are willing to assume these burdens does not make transfer preferable, though it does lessen this factor's weight. The Court must also consider that the Government would be required to bear similar burdens, though "the prosecutors would likely have support services in other resources available to them from the offices of the United States Attorney" for the District

of Arizona. *United States v. Radley*, 558 F. Supp. 2d 865, 882 (N.D. Ill. 2008). This *Platt* factor weighs against transfer, albeit only slightly.

### 8. Relative Accessibility of Place of Trial

The parties dispute whether Flagstaff would be a more accessible location for trial than Indianapolis. Before discussing which of those cities would be more accessible, the Court must note that transfer to the District of Arizona would not necessarily result in a transfer to its Flagstaff Division. This Court lacks authority to transfer cases to specific divisions. Under Federal Rule of Criminal Procedure 18, only the District of Arizona may assign the case to any one of its divisions "with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Civ. P. 18 advisory committee's note to 1966 amendment (eliminating division requirements because "[t]here is no constitutional right to trial within a division"); *see* Fed. R. Civ P. 21 advisory committee's note to 1966 amendment (explaining references to division were removed from Rule 21 in accordance with amendment to Rule 18). The District of Arizona could assign this case to its Phoenix, Tucson, or Yuma Division, but neither party offers any arguments about the relative accessibility of these cities, so the Court will discuss only Flagstaff.

When comparing Flagstaff to Indianapolis, Indianapolis is the more accessible location. The Andersons describe Flagstaff as a "major metropolitan area," but the estimated population of Flagstaff is roughly 77,000, whereas the estimated population of Indianapolis is approximately 882,000.[6] Additionally, the Indianapolis International Airport is the forty-seventh busiest airport in the United States, having emplaned 3,487,100 passengers in 2021, and is less than fourteen

---

[6] U.S. Census Bureau, City and Town Population Totals: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-cities-and-towns.html#tables; Fed. R. Evid. 201(b); *see, e.g.*, *Skolnick v. Board of Comm'rs of Cook Cnty.*, 435 F.2d 361, 363 (7th Cir. 1970) (taking judicial notice of census data).

miles from Indianapolis. The Flagstaff airport, however, is the two hundred eighth busiest airport, having enplaned only 115,596 passengers in 2021,[7] and the nearest major airport, the Phoenix Sky Harbor International Airport, is one hundred forty-eight miles away from Flagstaff.[8] The eighth *Platt* factor weighs against transfer.

### 9. Docket Conditions

Since the enactment of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, several courts, including this one, have considered this *Platt* factor to be neutral in criminal cases. *See Reis*, 2009 WL 3256217, at *5 ("Both sides agree that this factor is neutral because of the Speedy Trial Act."). But "[a]ssuming this factor still warrants any consideration," it does not weigh in favor of transfer. *United States v. Radley*, 558 F. Supp. 2d 865, 883 (N.D. Ill. 2008). The Southern District of Indiana manages one of the country's highest caseloads (823 cases per judge as of June 2022), but the District of Arizona does as well (750 cases per judge as of June 2022) (Filing No. 117 at 14). This difference is not great enough to favor transfer, particularly because "the focus of this factor is not the absolute number of cases in either district," and is instead "whether the Court 'will reach a disposition here sooner than it would if the case were transferred.'" *United States v. Bochene*, 579 F. Supp. 3d 177, 185 (D.D.C. 2022) (quoting *Quinn*, 401 F. Supp. 2d at 89). Because this Court is already familiar with the complex "background, facts, legal arguments and parties to this prosecution . . . the Court is unconvinced that transfer would expedite resolution of this case or would serve the interest in judicial economy." *Id.* This factor is neutral.

---

[7] Federal Aviation Admin., CY 2021 Enplanements at All Commercial Service Airports, https://www.faa.gov/airports/planning_capacity/passenger_allcargo_stats/passenger/cy21_commercial_service_enpl anements; Fed. R. Evid. 201(b); *see, e.g.*, *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (taking judicial notice of information available on government website); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information on official FDIC website).

[8] *See supra* fn. 3.

### 10.   Other Special Elements

The Government argues the timing of the Andersons' Motion is a special element weighing against transfer. The Government filed its original Indictment in August 2020, but the Andersons waited until July 22, 2022, nearly two years later, to move for transfer. Additionally, at the time the Andersons filed their motion, trial was set to begin in just five weeks (Filing No. 102, at ¶ 2). The Government explained that a transfer so late in this case would almost certainly cause a delay because the District of Arizona may not have availability to hold a week-long trial in the near future, and if the Andersons chose to retain new Arizona counsel, that counsel would need "significant time to process and review the discovery material[s] in this complex case". (Filing No. 117 at 15.) The Government's arguments are well-taken and still apply even though trial has since been continued and is now set to begin in approximately four months.

"[A] substantial amount of delay between the Indictment and the motion to transfer … ostensibly weighs against transfer." *United States v. Rodriguez*, No. 16-CR-41, 2018 WL 2126429 (W.D.N.Y. May 9, 2018); *see United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d. Cir. 1990), *cert. denied*, 501 U.S. 1211 (1991) (finding no error in district court's decision to deny transfer, which considered "that the motion was belated, having been made some nine months after commencement of the prosecution, after discovery was nearly complete, after substantive motions had been filed, and on the eve of the court's setting a trial date"). Transfer of this case at such a late stage "would necessitate not only that the new judge be bound by important decisions already made by this Court, but also that the [new] judge duplicate the efforts made by this Court to become familiar with the case." *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 463 (S.D.N.Y. 1997). Transfer would therefore "not comport with the efficient or fair administration of justice." *Id.* (denying defendants' motion to transfer). Further, "even though the complexity of the case and the extent of discovery might explain to some extent why the defendants waited so long to file their

venue motion, there is no explanation nor excuse why defense counsel failed earlier to bring to the Court's attention the possibility that such a motion was being contemplated." *Spy Factory, Inc.*, 951 F. Supp. at 463.

The Andersons argue that the Government's "special elements" argument is based on prejudice to the Andersons' right to a speedy trial, "which they fully understand despite making this request to transfer venue". (Filing No. 126 at 4.) However, speedy trials are also meant "to protect the public's interest in the speedy resolution of justice." *United States v. Larson*, 417 F.3d 741, 746 (7th Cir. 2005). It is therefore appropriate for the Court to consider the delay caused by the Andersons' belated motion as a "special element" weighing against transfer.

Federal courts nationwide have found that similar delays support a denial of transfer. *See, e.g.*, *United States v. Ubak-Offiong*, 364 F. App'x 859, 862–63 (5th Cir. 2010) (finding district court did not abuse discretion in denying transfer because "the factors were either neutral or cut against transferring the action . . . and further termed the motion (filed a mere week before trial) as 'a tactical move to delay the proceedings, rather than a genuine plea for relief'"); *United States v. Kopituk*, 690 F.2d 1289, 1321 n.29 (11th Cir. 1982) (finding defendants' delay in waiting to move for transfer until seven months after arraignment and three weeks before trial would be grounds to deny the motion to transfer); *United States v. Keuylian*, 602 F.2d 1033, 1038–39 (2d Cir. 1979) (finding district court did not abuse discretion in denying transfer after considering, in part, that "transfer would [have] delayed the trial, since the case would then have had to be placed at the end of some other district court's busy criminal docket"); *United States v. Williams*, No. 06-00079, 2013 WL 4510599, at *4 (D. Haw. Aug. 22, 2013) ("A transfer to another district would almost certainly delay trial, which is an untenable result given that Defendant could have raised this issue earlier and trial has been so long in coming."); *United States v. Smallwood*, 293 F. Supp.

2d 631, 641 (E.D. Va. 2003) ("[Defendants] delayed two and a half months after arraignment before moving for transfer and, at the time of the motion, the trial was set for December 8, 2003. Although trial has now been postponed to February 9, 2004 at the request of [defendants], their delay in moving for transfer is nonetheless a factor that weighs against transfer.").

The Andersons' delay in filing their Motion to Transfer and judicial economy considerations weigh against transfer.

B.  **Consideration of All Factors**

Three *Platt* factors support transfer—the defendants' location, the location of events in issue, and potential disruption to the defendants' businesses. However, for the reasons discussed above, each of those factors is being given only minimal weight. The remaining seven factors are either neutral or weigh against transfer. Two of those factors—the location of witnesses and the location of evidence likely to be involved—strongly weigh against transfer due to the overwhelming number of witnesses and amount of evidence that are already located in or near Indianapolis. The location of counsel, the relative accessibility of Indianapolis, and the delay that would result from a transfer, also weigh against transfer.

"The court is not suggesting that this is a math problem or that the answer should be derived by counting factors. Any ten-factor test is likely to present some real challenges in finding a common denominator for weighing incommensurable factors against one another." *Reis*, 2009 WL 3256217, at *6. Having weighed all the *Platt* factors, the Court concludes that the Andersons have not shown that, "all things considered, 'the case would be better off transferred to' the District of Arizona," and the Court therefore **denies** transfer. *Id.* (quoting *In re Balsimo*, 68 F.3d at 187).

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Andersons' Motion to Transfer Venue to the District of Arizona (Filing No. 102).

**SO ORDERED**.

Date: 11/18/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Austin Andreas
KEFFER HIRSCHAUER LLP
andreas@indyjustice.com

Bradley A. Keffer
KEFFER HIRSCHAUER LLP
keffer@khindy.com

Abhishek Kambli
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
abhishek.kambli@usdoj.gov

M. Kendra Klump
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kendra.klump@usdoj.gov